JRO:MKD:jlb 37171 \pleading\37171MSJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FREDERICK TEDESCHI | : | |
| | : | |
| VS. | : | C. A. NO. 2005-304ML |
| | : | |
| TRAVIS & NATALIE, INC. | : | |

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes defendant in the above-entitled action and hereby moves this Honorable Court for partial summary judgment on plaintiff's claims based on the Jones Act. 46 App.U.S.C. §688. Plaintiff is unable as a matter of law to prove either: (1) that defendant negligently hired or retained a crewman with known vicious propensities; or (2) that the plaintiff was acting within the course of his employment at the time of his injury. Defendant relies on the attached memorandum of law in support of its motion.

DEFENDANT,
By Its Attorneys,

J. Renn Olenn, Esq. #0623
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

Martin K. DeMagistris, Esq. #6089
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

JRO:MKD:co 37171 \pleading\37171Memo PSJ

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FREDERICK TEDESCHI | : | |
| | : | |
| VS. | : | C. A. NO. 2005-304ML |
| | : | |
| TRAVIS & NATALIE, INC. | : | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Defendant, Travis & Natalie, Inc. ("Travis & Natalie"), files this motion for summary judgment with respect to plaintiff's claims under the Jones Act, 46 U.S.C. App. 688. Defendants contend that they are entitled to summary judgment on two grounds. First, there is no dispute based on the undisputed facts and testimony that the plaintiff was not acting in the "course of his employment" as required under 46 U.S.C. §688, at the time of the assault. Secondly, no reasonable juror could conclude that either defendant or defendant's agents were negligent in hiring plaintiff's assailant, Benjamin "Tom" Troyer ("Troyer"). Neither plaintiff, defendant, defendant's agents, fellow crewman, nor any other person identified by plaintiff, can testify that Troyer exhibited violent or vicious behavior that would have put, or should have put, defendant on notice that he was a crewman of vicious propensities.

## II. LEGAL ARGUMENT

### A. Plaintiff was not acting within the "course of employment" either at the time of his injury, nor in the hours leading up to his injury.

In order to prevail under the Jones Act, a seaman must prove that his injury occurred while he

or she was acting in the course of their employment. 46 App. U.S.C.A. §688. In the context of seamen assault cases, the most relevant case on the subject is *Colon v. Apex Marine Corp.*, 832 F.Supp. 508 (D.R.I. 1993), affd., 35 F.3rd 16, cert. den. 514 U.S. 1018. In *Colon v. Apex Marine*, three crewmen on the *S/T Charleston* went on authorized shore leave in Providence, Rhode Island. The plaintiff, Daniel Colon, the ship's engineer, and two crewmen, DeJesus and McCarthy, found themselves in the same bar by coincidence between approximately 9:30 and 10:00 p.m. While drinking together, an altercation broke out between DeJesus and McCarthy. The plaintiff and the bartender intervened and separated them. After the two men were released, DeJesus again tried to attack McCarthy and McCarthy sought refuge behind Colon, the plaintiff. Attempting to calm DeJesus and prevent him from attacking McCarthy, Colon put his hands out in a peaceful manner, at which time DeJesus pulled out a knife and stabbed Colon in the side, resulting in substantial injuries.

The plaintiff filed suit against the owner of the vessel under the Jones Act for negligent retention of DeJesus, alleging that the owner had notice of his violent propensities. The defendants moved for summary judgment on two grounds; first, that the plaintiff was not acting within the "course of his employment" when he was injured. Secondly, that the owners were unaware of the dangerous propensities on the part of DeJesus. Citing DeJesus' prior threats and other incidents that had been reported to the captain by McCarthy, the court held that there was an issue of fact over the forseeability of potential violent acts by DeJesus.

The court granted summary judgment on the issue of course of employment. The defendants argued that while he was on shore leave, Colon was not in the performance of his duties and, therefore, not in the course of his employment. The plaintiff argued that even while on shore leave, a seaman is in service of the vessel and, therefore, within the course of employment. In support of

their theory, the plaintiffs cited a number of cases in which the "in service of the vessel" standard, applicable to claims for maintenance and cure, was deemed equivalent to the "course of employment" standard in the Jones Act. *Id.* at 512, citing *Aguilar v. Standard Oil Co.*, 318 U.S. 724 (1943); *Warren v. United States*, 340 U.S. 523 (1951); *Daughenbaugh v. Bethlehem Steel Corp., Great Lakes SS Div.*, 891 F.2nd 1199 (6th Cir. 1989).

In response, the court found that the U.S. Supreme Court had differentiated the "in service of the vessel" standard from the "course of employment" standard in *Braen v. Pfeifer Oil Transp. Co.*, 361 U.S. 129 (1959). In *Braen*, the court stated that the plaintiff had been acting "in the course of his employment" at the time of the injury, "for at that moment, he was doing the work of his employer pursuant to his employer's orders." *Id.* at 513, quoting *Braen* 361 U.S. at 133. Analyzing this in the context of a barroom fight, the court held that Colon was not acting pursuant to his employer's orders by being in the bar at the time or in attempting to break up the fight. The court went on to cite a number of other cases from other jurisdictions likewise finding the "course of employment" standard more stringent than that applicable to maintenance and cure.

Based on this course of employment standard, the court held that Colon was on his own personal time at the time of the altercation, not acting pursuant to any orders or duties to the ship, its owners, or agents, and, therefore, summary judgment was appropriate.

The same finding is unavoidable in the instant case. The plaintiff has stated unequivocally that he had intended to stay over Troyer's house the evening of the attack. He had no dutites or orders to be on the vessel that night. He did not intend to be on the vessel, and the only reason he was there was because of the earlier altercation with Troyer.

**Deposition of plaintiff, p. 116, l. 3 through p. 117, l. 6**

Q. Do you remember what time you left the point in order to go Troyer's home?

A. I am going to say 9:30, ten o'clock, 9:30 [p.m.].

Q. Had you had anything to eat that evening?

A. I don't remember, I am sure we ate lunch that day while we were working.

Q. Did you have anything to eat on the way home to Troyer's house?

A. I don't remember. Maybe I grabbed something from the gas station, I don't remember, really.

Q. When you left the Point to go to Troyer's home, what had he invited you to do other than come along and give him some cover?

A. He said to go my house (sic.) and have a few cocktails and you get a good night's sleep and off the boat and we'll go to the boat the next day, we'll go there early and clean up, because Fred had somebody from Sunderland Marine. He said, we'll surprise him and we'll make the boat spic-and-span, and we'll go there early and we'll go fishing the next afternoon.

Q. So the invitation you accepted was one to go to Troyer's home?

A. Yes.

Q. From the boat?

A. Yes.

Q. To have some cocktails?

A. Yes.

Q. And to spend the night?

A. Yes.

The only reason plaintiff was on the vessel was because of the fight that occurred earlier in the evening between Troyer and himself, during which he hit Troyer in the fact with an empty bottle of whiskey. He had not intended on being on the vessel and, therefore, clearly had no orders or duties. In fact, the dispute between Troyer and plaintiff resulting in Tedeschi's assault on Troyer, had nothing to do with fishing or the vessel and started only after several hours of drinking in the parking lot and at Troyer's house.

**Plaintiff's deposition, p. 144, l. 14 through p. 145, l. 25**

Q. I take it you agree that this assault on you by Tom Troyer had nothing to do with fishing operations or your performance as a crewman?

MR. O'KEEFE: Objection.

A. I don't know what his thoughts were. Why does a man drive a half hour or whatever it is from Richmond to Galilee with a chain saw and take it on a boat to go attack somebody? Why can't he fight you fist to fist or man to man, as the saying goes. I don't know what drives somebody to pick up a chain saw.

Q. Do you agree that this assault by Troyer on you with the chain saw and pointing the knife at your throat, was as a result of the fight that had happened in the house and not the result of anything that you two had started on the boat?

MR. O'KEEFE: Objection.

A. No, I don't agree with that.

Q. It started on the boat?

A. Yes, two separate incidents. If he is fighting with his wife, he is fighting with his wife, but the fact that we had an altercation earlier is not justification for him to come down and attack me. It's a separate incident. It's three hours later. If this is a result of that incident that happened at his house, he should have come right down to the boat right afterwards, not three hours later.

Q. Do you agree with me that him coming down to the boat had nothing to do with any dispute that you and he had had on any of your fishing trips?

MR. O'KEEFE: Objection.

A. I could agree with that, yes. As stated earlier, we had never had a dispute on any fishing trips.

Q. So there is no question in your mind that he wasn't using his role as captain to punish you for something you had done on the boat or failed to do on the boat?

MR. O'KEEFE: Objection.

A. I don't believe so.

**Plaintiff's deposition, p. 92, l. 11 through p. 93, l. 6**

Q. When you were working with Mr. Troyer, did you know anything about him? When I say working, I am talking about the five trips you made, how was his performance as a crewman?

A. He was a good guy on a boat.

Q. How was yours?

A. I would like to think I was a good guy on the boat. I would like to think I was an asset to whatever crew I was on.

Q. Would you evaluate Mr. Troyer the same as a deckhand?

A. Yes, he was very knowledgeable and very good at what he did.

Q. What was your relationship with him during that, those five trips?

A. Co-workers, we worked actually -- we teamed up quite a bit. There were four crewmen on the boat and we kind of had two on one side and two on the other. We had similar knowledge of fishing gear and so forth. So we were able to communicate well. We worked very well together. I would say we worked very, very well together.

**Plaintiff's deposition, p. 93, l. 23 through p. 94, l. 5**

Q. Tell me about the sixth trip where Mr. Troyer was the captain.
Excuse me, on those previous five trips who was the captain?

A. Fred, Mr. Mattera.

Q. You never had any reason to go to Mr. Mattera and complain
about Mr. Troyer, did you?

A. No. Like I said, his work performance was good. We worked
well together.

Therefore, it is a matter of fact in this case, that Tedeschi was on the boat on the night of the incident for two reasons: (1) Mattera allowed him to stay on the vessel as an accommodation, so that he did not have to seek or pay for lodging elsewhere prior to a trip; and (2) in order to escape any potential retribution for further fighting arising from his assault on Troyer. Had Tedeschi been staying at a motel, at a friend's house, or anywhere else, that is where Troyer would have gone to find him.

Therefore, it is clear that, even according to the plaintiff, plaintiff was on the vessel for purely personal reasons. Just as the court stated in *Colon*, "he had no obligation of any kind to the vessel, its officers or owners..." *Colon v. Apex Marine Corp.*, 832 F.Supp. at 515.

**B. Defendant is entitled to summary judgment on plaintiff's Jones Act claim since plaintiff is unable as a matter of law to show constructive or actual knowledge of Troyer's violent propensities.**

It is well established that a vessel owner can be held liable for the negligent retention of an employee who assaults a fellow crewman only where "(1) the assailant is a person of known vicious character and (2) the ship owner knew or should have known of the crew members' violent propensities." *Colon v. Apex Marine Corp.*, 832 F.Supp. at 511, quoting *Wiradihardja v. Bermuda*

*Star Line, Inc.*, 802 F.Supp. 989, 993 (S.D.N.Y. 1992). Even prior incidents involving the assailant are insufficient to support a negligent retention claim under the Jones Act unless the assailant's history evidences a violent disposition sufficient to require his dismissal. See *Connolly v. Farrell Lines, Inc.*, 268 F.2d 653 (1st Cir. 1959) (prior incidents where knife was found under the pillow of plaintiff's assailant and assailant's drunken disobedience of the captain's orders held insufficient to constitute negligent hiring of vicious or violent crewmen); *Kowalski v. American S.S. Co.*, 954 F.Supp. 140 (E.D.Mich. 1995) (ship owner's knowledge that assailant-crew member drank and used illegal drugs held insufficient to constitute notice, actual or constructive, that crew member's drunkenness and drug abuse would result in risk or peril to fellow crewmen); *Torres v. M/V Fuiono Fishing Vessel*, 141 F.Supp.2d 1028 (S.D.Cal. 2001) (deck bosses knowledge of assailant's prior assault held insufficient to constitute negligent retention or hiring since deck boss did not believe assailant to have a violent disposition).

Even in circumstances where there are prior incidents involving the assailant, such incidents do not necessarily serve to put a vessel owner on notice of a seamen's violent propensities. As Judge Learned hand stated, "sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons as insufficient provocation for a personal encounter, is not the measure of the 'disposition' of the 'ordinary man in the calling.'" *Jones v. Lykes Brothers S.S. Co.*, 204 F.2d 815, 817 (2nd Cir. 1952), cert. den., 346 U.S. 857 (1953). "The seamen, in a sense, accepts the risk of encountering crew members whose disposition may be more irascible than his own but which cannot be deemed so savage that shipboard life becomes a menace." *Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191, 193 (2nd Cir. 1962).

Contrary to these findings, neither the plaintiff, Mattera, or any other witness, has identified

any instance indicating that an assault such as the one committed on plaintiff was foreseeable. As plaintiff states in his deposition:

**Plaintiff's deposition, p. 108, l. 18**

Q. Did any crewman then or right up to the present discuss with you that they had had a prior problem with Troyer before the incident with you?

A. No.

Q. So you have never heard from anyone that Troyer was someone given to fighting?

A. No. That I had heard. I never heard that they had had a problem with him, no, nobody I know had an altercation with him, to clarify.

**Plaintiff's deposition, p. 109, l. 23**

Q. Can you give me the name of any person that you know of, any other fisherman who had a fistfight or a physical altercation with Tom Troyer?

A. Well, Mike Long earlier that night, that's the only other person I witnessed have an altercation with him.

Q. Now I want the name of any fisherman you know of who has told you that they had an altercation with Tom Troyer, a physical altercation?

A. I don't have anybody I know who has told me that they had a fight with him.

Q. Do you have the name of any fisherman who has told you they know that Tom Troyer had a fistfight with someone else?

A. No, I didn't care about his personal business.

Q. I am talking about from then now until now.

A. No, I don't know of anybody has had a physical altercation. I don't recall anybody's name who told me they had a fight of any kind with Tom, other than the fight earlier that night with Mike Long. I don't know, he could have been bragging about things he did do or didn't do. You know, talk is talk. I never saw him fight with anybody other than that night, and I never heard of anything since then other than with Mike Long.

Q. Which happened that night?

A. Which happened earlier that night.

The plaintiff can point to no prior incident that would have put any reasonable boat owner on notice of any violent propensities that Troyer may have had. Furthermore, as Mattera states in his answers to interrogatory #5, he is unaware of any altercation or fight, other than that involving the plaintiff, involving Troyer. Therefore, regardless of the attack on the plaintiff, it could not be stated that Troyer was "a person of known vicious character" as is required in a finding of Jones Act negligence. *Wiradihardja v. Bermuda Star Line, Inc.*, 802 F.Supp. 989, 993 (S.D.N.Y. 1992). As stated in *Connolly v. Farrell Lines, Inc.*, supra, a ship owner cannot be liable for an isolated assault where there is no evidence that the assailant was a habitual violator of ship discipline. *Id.* at 655; see also *Clark v. U.S.*, 1995 WL 600893 (E.D.La. 1995).

As the court in *McKinley v. Afram Lines Co., Ltd.*, 834 F.Supp. 510 (D.Mass. 1993) stated in granting summary judgment to the defendant shipowner, in all cases based on forseeability "the plaintiff must prove that the assailant constituted a foreseeable risk to the plaintiff against which the ship owner had a duty to guard...stated otherwise, there must be some showing that defendant should have known that [the assailant] was a source of peril to those sailing with him." *Id.* at 514-15. In *McKinley*, the court granted summary judgment based on the lack of evidence of the assailant's violent propensity. The only incident involved the assailant's prior threat of physical violence to a

fellow crewman, made 5 to 6 days prior to the assault giving rise to the action. See also *Fountain v. John E. Graham & Sons*, 833 F.Supp. 873 (S.D.Ala. 1993) (summary judgment granted to defendants where assailant had exhibited no violent propensities, was not easily riled, and there was no evidence that defendant had notice of violent propensities).

Plaintiff will no doubt attempt to make much of Troyer's past criminal history in contending that it exhibits a propensity to violence, sufficient to put defendant on constructive notice of his violent propensities. However, this is unsupported by either his criminal history or case law. "The courts…have not been receptive to such a theory. If the criminal conduct which the employer failed to uncover bears little relationship to violent propensities, the courts have held that any negligence of the employer was not such that the employer should have reasonably foreseen the assault." *Green v. River Terminal Railway Co.*, 585 F.Supp. 1019, 1025 (D.C.Oh. 1985), citing *Lambert v. Morania Oil Tanker Corp.*, 677 F.2nd 245 (2nd Cir. 1982) (conviction for unauthorized use of motor vehicle insufficient to constitute violent propensities); *Brooks v. Washington Terminal Company*, 593 F.2d 1285 (D.C.R.I. 1979), cert. denied, 442 U.S. 910 (1979) (arrests for petty larceny and possession of drugs insufficient to constitute constructive notice).

Troyer's criminal history includes two convictions for breaking and entering a dwelling without consent which occurred in 1982 and 1986 respectively; a misdemeanor of simple assault/battery to which he plead nolo contendere in 1997.

Conversely, Troyer's experience and qualifications in seamanship were exemplary. He carried 100 ton and 200 ton pilotage licenses which he used in his employment piloting barges in Louisiana. In fact, his experience and education made him a more qualified and competent seaman than any other crew member on the boat. Based on the complete absence of evidence indicating any violent or

vicious propensities, either on a vessel or off, no reasonable vessel owner could foresee the risk of the attack giving rise to this action. A single conviction of "misdemeanor simple assault/battery" occurring seven (7) years prior to the assault at issue, by itself, is insufficient as a matter of law to constitute negligent hiring or retention of a crewman of "known vicious character." The more daunting challenge would be to find a crewman on a fishing vessel that did not have such a conviction.

## III. CONCLUSION

Based on the foregoing, plaintiff's counts for Jones Act negligence should be dismissed as a matter of law. The undisputed facts show that plaintiff was not acting in the course of his employment when the attack occurred and there is an absence of any evidence indicating that such an attack was foreseeable.

RESPECTFULLY SUBMITTED,

DEFENDANT,
By its Attorneys,

J. Renn Olenn by MWD #6087

J. Renn Olenn, Esq. #0623
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

Martin K. DeMagistris, Esq. #6089
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 5/12/06 to:

Merlyn O'Keefe, Esq.
Packer & O'Keefe
1220 Kingstown Road
Peace Dale, RI 02879

**CERTIFICATION**

I certify that I sent a true copy of the within on 5/15/06 to:

Merlyn O'Keefe, Esq.
Packer & O'Keefe
1220 Kingstown Road
Peace Dale, RI 02879

Jessica Beaudry