JRO:cli/pleadings/37171objpartsumjudg.wpd

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| FREDERICK TEDESCHI | : | |
| | : | |
| VS. | : | C. A. NO. 2005-304ML |
| | : | |
| TRAVIS & NATALIE, INC. | : | |

**DEFENDANT'S OBJECTION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Now comes the defendant in the above matter and hereby objects to plaintiff's motion for partial summary judgment.

A memorandum in opposition to plaintiff's motion for partial summary judgment was previously submitted.

DEFENDANT,
By its Attorney,

J. Renn Olenn, Esq. #0623
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

for

Martin K. DeMagistris, Esq. #6089
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 6/16/06 to:

Merlyn O'Keefe, Esq.
Packer & O'Keefe
1220 Kingstown Road
Peace Dale, RI 02879

Cherie L. Iacono

JRO:MKD:co 37171 \pleading\37171Memo in Opp

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| FREDERICK TEDESCHI | : | |
| | : | |
| VS. | : | C. A. NO. 2005-304ML |
| | : | |
| TRAVIS & NATALIE, INC. | : | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY ON COUNT III - BREACH OF WARRANTY OF SEAWORTHINESS**

## I. FACTS AND BACKGROUND

Plaintiff, Frederick Tedeschi, Jr. ("Tedeschi"), was employed as a deck hand on the *F/V Travis and Natalie* ("vessel") for approximately two months in 2004. The defendant, Travis & Natalie, Inc., is a Rhode Island corporation wholly owned by Frederick J. Mattera ("Mattera"). Mattera is the sole owner of the vessel, an offshore trawler fishing out of the Port of Galilee at Point Judith, Rhode Island.

The vessel returned from a fishing trip on or about September 26, 2004 and unloaded the catch. Thereafter, the crew spent September 28th and 29th changing the "gear" on the vessel to prepare it to operate in a different fishery. The boat's crew consisted of the plaintiff, Benjamin "Tom" Troyer, Fred Angel, and Peter Tutko.

After finishing the gear work at approximately 5:30 p.m. on the evening of September 29th, the plaintiff and Troyer stood in the parking lot of the dock where they came upon Mike Long ("Long"), a long time acquaintance of Tedeschi from his hometown in Long Island. The three men stood in the parking lot, passing around a bottle of whiskey and talking. Between 9:00 and 10:00 p.m., after receiving several calls from his wife, Troyer suggested that the three of them drive to his

home in Richmond, Rhode Island, to continue drinking and to stay for the night. The three men drove together in Troyer's pickup truck, and arrived at Troyer's home at approximately 30 minutes later. They continued drinking whiskey and beer for several hours.

In the early morning hours, a fight broke out among the three men; Long and Tedeschi against Troyer. Troyer was punched about the head and torso and hit in the face by Tedeschi with an empty bottle of Jack Daniels. Rose immediately drove Tedeschi and Long back to Point Judith and returned home to Richmond. Approximately one hour later, Troyer and his wife arrived back at Point Judith. In his motion, plaintiff attempts to create a different timeline, increasing the time between Tedeschi's assault on Troyer and Troyer's on Tedeschi's. However, the police statements of all the witnesses, including the plaintiff and Long, describe the span of time between Rose dropping the plaintiff and Long off at the vessel and Troyer and Rose's return, as about one hour.

According to Troyer's statement to the police, he got out of his truck, and proceeded to slash all four tires on Tedeschi's truck. He walked onto the boat to confront the men, but went back to his truck to get a chainsaw in case they were behind a locked door. He went into the living quarters and saw the door to the head closed. Troyer started the chainsaw and proceeded to cut the door down. After cutting through it, he went to the deck, put the chainsaw down and took out a knife. He went back to the bathroom and started screaming at Tedeschi about the prior assault and threatened him with the knife. At that point, he realized that Tedeschi's arm had been cut and was bleeding. He told Tedeschi that the cut looked bad and that he would need 911 and proceeded to leave the boat.

As he left the vessel, Troyer was confronted by a Narragansett police officer, he dropped the knife, and went to the ground. He was arrested, charged, and eventually convicted of felony assault.

The police took statements from Long, Tedeschi, Rose, and Troyer, about what happened that

night. Rose restated the facts substantially as described above. However, she also stated that while driving Tedeschi and Long to the boat, they inappropriately fondled her.

Tedeschi's statement to the police was substantially the same as that described above, except in two particulars. He stated that he did not strike Troyer with a bottle and did not assault him.

Long also stated substantially the same as the above recitation, except that he did not mention and was not asked about any sexually unwelcome contact with Rose.

Tedeschi was charged with felony assault with a deadly weapon for striking Troyer in the face with the empty bottle. He eventually plead to a charge of simple assault and battery.

In his statement to the police, Troyer stated that he had no intention of cutting either of the men with the chainsaw, and did not know how it happened. He intended only to cut through the door. He stated that he only intended on scaring them. In fact, Tedeschi's statement corroborates Troyer's reaction to his wound.

Tedeschi suffered a deep laceration to his arm, approximately 7 to 8 centimeters long and 5 centimeters wide. He underwent surgery on the day of the incident, September 30, 2006. He was cleared to work without restriction by his physician approximately one month later, on November 17, 2004. (See Exhibit A attached)

## II. LEGAL ARGUMENT

### A. The Plaintiff Was Not "In Service of the Vessel" at the Time of the Assault.

The plaintiff makes the argument that under *Macedo v. F/V Paul & Michelle*, 868 F.2d 519 (1st Cir. 1989), he was "in service of the vessel" because he was answerable to its call at the time of the attack, even if he was not performing any action in furtherance of the vessel's business. This is

wrong in two particulars. First, the "answerable to the call of the vessel" standard for the "in service" determination has never been used except in determining a seaman's entitlement to maintenance and cure; not in justifying a claim for unseaworthiness. The "in service" for maintenance and cure purposes is an extremely liberal standard reflective of the intent behind maintenance and cure; to provide seamen with a subsistence allowance and medical care as a matter of right, without the need for significant evidentiary procedures. No such standard is applicable to the warranty of seaworthiness which inherently does not follow a seaman in his private endeavors.[1]

Secondly, even assuming the "answerable to the call of the vessel" standard were applicable, it could hardly be said that after drinking all night and getting in a fight to beat up Troyer, that he could be subject to Troyer calling him to disembark on a trip or prepare the boat for a voyage. In fact, having assaulted a fellow crewman with a deadly weapon, Tedeschi could not expect that Mattera would permit him to go on the next trip. Regardless, neither Troyer nor Tedeschi were capable of being called to duty after they started drinking that night, as it was squarely violative of the boat's policy and of industry practice. Therefore, if anything, Tedeschi was in the position of the plaintiff in *Keeping v. Dawson*, 262 F.2d 868 (1st Cir. 1989), where the court held the plaintiff was not entitled to maintenance and cure for an injury sustained while the ship was in its home port since there was no evidence indicating that he was answerable to the ship's call. In this case, there is little question that Tedeschi was not answerable to the call of the Travis & Natalie, its captain or owner and had left the boat intending to drink alcohol and socialize spend the night at Troyer's.

[1]Defendant disagrees that the "in service of the vessel" as opposed to the "course of employment" standard is applicable to plaintiff's claim of unseaworthiness. Defendant fully intends on contending at trial that plaintiff must show that he was acting within the course of his employment at the time of his injury.

The plaintiff has also admitted, during both his deposition and in his police statement, that he went to Troyer's home for the night not intending to return to the vessel until the next day with his fellow crew members. This is incontrovertible since neither Long nor Tedeschi drove their trucks to Troyer's home, but rather accompanied Troyer in his truck.

The plaintiff has attempted to avoid this damaging evidence by claiming in his deposition that he served a purpose while sleeping on the boat; that is, to turn on a pump in the wheelhouse in the event that the boat started sinking while at dock. As Mattera testified at his deposition, he has never needed anyone to stay on the boat overnight for any reason and allowed the plaintiff to sleep there only as an accommodation to the plaintiff because he did not have a place to stay locally. Regardless, plaintiff's admission that he had no intention of staying on the boat that night shows he was performing no duties as a seaman. Attempting to salvage this damaging evidence, plaintiff makes the unsupported contention that he was "some sort of night watchman." (Memorandum of Points and Authorities in Support of plaintiff's Motion for Partial Summary Judgment, pg. 5 ). As stated above, Mattera has never had anyone stay on the boat overnight as night watchman or to serve any other purpose on the vessel. In fact, the plaintiff has produced no witness or evidence that anyone has ever stayed on the vessel for either of these purposes.

### B. It is a question of fact whether Troyer's presence made the vessel unseaworthy in the time prior to the attack

The plaintiff has brought this motion in an attempt to establish that because Troyer used a chainsaw in committing the assault and battery upon the plaintiff, that he was a person of a savage and vicious nature, outside the disposition of the ordinary seaman. In order to prevail on the

unseaworthiness claim, the plaintiff must show that the assailant crewman had a disposition of such savage and vicious nature, that his mere presence on the vessel posed a substantial threat to the rest of the crew prior to the attack, making the vessel unseaworthy.

As discussed below, whether or not Troyer was of such a savage or vicious disposition to render the vessel unseaworthy *prior to and leading up to* the attack is a question left to the trier of fact. The Second Circuit has emphatically stated this even in circumstances where a deadly weapon and prior incidents are conclusively shown:

> In no case has this court held that an assault with a weapon establishes as a matter of law that the attacker is not equal in disposition to other men in the calling. Such evidence, even when coupled with proof of prior vicious conduct, creates a question of fact concerning the assailant's disposition for the jury to resolve. *Gerald v. United States Lines Co.*, 368 F.2d 343 (2d Cir. 1966), citing *Horton v. Moore-McCormack Lines, Inc.*, 326 F.2d 104 (2d Cir. 1964); *Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191, 193-194 (2d Cir. 1962) and cases there cited; see also *Miles v. Melrose*, 882 F.2d 976 (5th Cir. 1989).

Therefore, the plaintiff's motion seeking to find Troyer savage and vicious as a matter of law is simply not proper and rests on issues which are inherently within the purview of the trier of fact.

**1. Although it Remains a Questions of Fact, Troyer's Assault on Plaintiff Does Not Indicate a Savage and Vicious Disposition in Light of Other Caselaw And the Actual Events of the Evening**

A chainsaw makes for an "attention-grabbing" weapon in an assault case, and plaintiff understandably makes much of it in his motion. However, upon closer examination, the incident itself does not support the allegation of Troyer's savagery or viciousness. For instance, there is convincing evidence that Troyer intended only to scare the plaintiff with the chainsaw and not to actually cut him with it. When the door was cut off and Troyer could see that Tedeschi was cut, he

stopped, told Tedeschi that he should call 911 and began to walk off the boat. These are actions that tend to ameliorate this attack.

A claim that a vessel was unseaworthy because one's assailant was savage or vicious in nature is susceptible to one of two modes of proof: (1) by independent evidence with regard to the assailant's temperament and disposition; or (2) by direct evidence showing a vicious and unprovoked attack. *Smith v. Lauritzen*, 356 F.2d 171 (3rd Cir. 1966). The first is typically shown by prior specific instances of violent attacks indicating a propensity for violence. The latter can be shown through prior incidents indicative of a savage nature or through the savageness or viciousness of the attack giving rise to the action. However, in the latter instances, the Supreme Court has emphatically held that "it is the 'disposition' of the assailant, rather than simply the severity of the act, that is material to the issue of unseaworthiness." *Id.* Quoting *Jones v. Lykes Bros. S.S. Co.*, 204 F.2d 815, 817 (2d Cir. 1953).

Courts consider a number of factors in determining a seaman's disposition. Several courts have listed the factors as: a) provocation, b) severity of injury, c) prior and subsequent acts of violence, d) use of weapons, e) physical differences, and f) a planned attack or intent to kill. *Macke v. Mississippi Belle II, Inc.*, 121 F.Supp.2d 1069, 1076 (S.D.Ia. 2002), citing *Torres v. F/V Fuiono Fishing Vessel*, 141 F.Supp.2d 1028, 1038 (S.D.Cal. 2002), rev'd, 2002 WL 188946 (9th Cir. 2002);

As the court in *Hildebrand v. S.S. Commander*, 247 F.Supp. 625, 628 (D.C.Va. 1965) stated:

> We think that each of these assault cases must turn upon the individual facts bearing in mind the use or attempted use of a dangerous weapon, the extent of any provocation, a determination as to who was the aggressor and the force used to repel any assault, the history of prior incidents touching the character traits of the assailant, evidence of contrition, and the overall totality of circumstances. Certainly when an assailant acts under no provocation whatsoever and his movements have

> not been stimulated by intoxicating beverages so frequently leading to the typical 'sailors' brawl', such facts, standing alone, go a long way in establishing the seaman as being of a vicious nature. *Hildebrand v. S.S. Commander*, 247 F.Supp. 625, 628 (D.C.Va. 1965)

The cases in admiralty jurisprudence that have found that an assailant's presence constituted an unseaworthy condition are distinguishable in several ways. The assailant's vicious intent and lack of provocation in those cases are the most readily apparent differences. In *Clevenger v. Star Fish & Oyster Co., Inc.*, 325 F.2d 397 (5th Cir. 1963), the assailant stabbed the plaintiff in the back with a "devil's fork," a four foot long ice chisel used for unloading fish. In *Smith v. Lauritzen*, supra., the assailant repeatedly beat the plaintiff with a cargo hook used for unloading bags of cargo. In *Miles v. Melrose*, 882 F.2d 976 (5th Cir. 1989), the assailant murdered the plaintiff by stabbing him 62 times. In *Claborn v. Star Fish & Oyster Co, Inc.*, 578 F.2d 983 (5th Cir. 1978), the assailant stabbed the plaintiff's decedent to death in the back with a 10 inch bait knife, "without warning or provocation." In *Keen v. Overseas Tankship Co.*, 194 F.2d 515 (2nd Cir. 1952), the plaintiff was attacked and stabbed in the back of the head with a meat cleaver.

In *Boudin v. Lykes Bros S.S. Co.*, 348 U.S. 336 (1955), the assailant, Gonzalez, after drinking approximately a fifth of alcohol, surreptitiously went into the plaintiff's bunk room while he was sleeping and attempted to steal a bottle of brandy located under the plaintiff's bed. When the plaintiff awoke, Gonzalez beat him with the bottle, causing severe injuries. Shortly after the initial attack, Gonzalez went to get a large knife with which to further attack the plaintiff in the ship's hospital. Based on these facts and the assailant's history, the Supreme Court upheld the District Court's finding that Gonzalez was a person of vicious character and propensities outside that of the ordinary seaman.

The evidence in this case does not indicate that Troyer was of such a savage and vicious nature

as to make the vessel unseaworthy in the time leading up to the assault. Rather, the evidence will show that Troyer was an exceedingly competent seaman on defendant's vessel and worked with the crew, and in particular the plaintiff, in a peaceful manner, consistent with the disposition of the ordinary seaman. He was not known to have a problem with drugs or alcohol while he worked for the defendant. In fact, since he was licensed and worked as a tug boat captain in Louisiana on a regular basis, he was required to take drug tests before every single trip.

The attack itself is also far different in character than those in the above-referenced cases. In this case, the chainsaw itself, and not the manner in which it was actually used, is the only element supportive of plaintiff's claim. Troyer stated to the police that he had no intention of cutting anyone with the chainsaw and it is undisputed that he stopped the attack once he saw that Tedeschi had been cut when the blade went through the door. Ironically, if Troyer had intentionally attacked Tedeschi with his fists and inflicted more severe injuries than a lacerated arm, it would likely be found to be a mere sailor's brawl brought on by drunken fighting. See *Walters v. Moore-McCormack Lines, Inc.*, 309 F.2d 191 (2nd Cir. 1962) (Trial court properly directed a verdict for defendant on unseaworthiness count even though assailant furiously beat plaintiff-messman with his fists after dispute over food service, and plaintiff was taken away on a stretcher); *Jones v. Lykes Bros. Steamship Co.*, 204 F.2d 815 (2nd Cir. 1953). In fact, a number of courts have refused to make a finding of unseaworthiness in cases where the attacks were far more brutal, purposeful, and malevolent, than that here.

In *Mears v. American Export lines, Inc.*, 457 F.Supp. 846 (D.C.N.Y. 1978), the plaintiff's assailant stabbed him repeatedly in the forehead, chin, and abdomen, with a paring knife. The testimony indicated that the plaintiff stood in the doorway of assailant's room and hurled verbal

insults at him. Arrequi, the assailant, "apparently pushed to a point beyond self-control, ran across the room, grabbed a knife and repeatedly stabbed plaintiff." *Id.* at 848. There was no claim of self-defense or prior physical altercation, yet the court found that plaintiff failed to show Arrequi's savage nature by the single attack. Rather, the assailant was shown to be generally peaceful throughout his career as a seaman. In essence the court found that Arrequi's attack, although substantially unprovoked, was insufficient to establish him as having a savage or vicious disposition with respect to his status as a crewman. Given the totality of the circumstances surrounding the attack, he could not be considered to have a disposition so far outside that of the ordinary seaman as to render the ship unseaworthy.

In *Robinson v. S.S. Atlantic Starling*, 369 F.2d 69 (5th Cir. 1966), no unseaworthiness was found despite the fact that the assailant-crewman stabbed the ship's captain in the abdomen with a knife. The captain's mistreatment of the crew on a regular basis was found to be a sufficient mitigating factor. The court in fact found that despite the severity of the attack, the assailant was "quiet, peaceful, efficient seaman…equal in disposition and seamanship to the ordinary men in the calling." *Id.* at 71.

As in this case, the assailant in *Kable v. U.S.*, 169 F.2d 90 (2nd Cir. 1948) had been attacked about an hour before he attacked the plaintiff. During a verbal disagreement on the boat, the plaintiff struck the assailant three times in the head with a handgun. Approximately one hour later, the assailant sought retribution and "badly pummeled" the plaintiff. The court almost cursorily upheld the lower court's finding that there was no evidence that the assailant was a person of savage character, and therefore no finding of unseaworthiness. Clearly, the court acknowledged that the prior assault with a deadly weapon was the mitigating factor in determining the assailant's character.

In *Torres v. F/V Fuiono Fishing Vessel*, supra., the plaintiff's assailant, reacting to a perceived knife attack by plaintiff, knocked the plaintiff unconscious and continued stomping on his head after he was on the floor. Shortly thereafter, he got a metal bar with which to further beat the plaintiff, only to be restrained by fellow crewmen who were attending to plaintiff's injuries. The plaintiff's face and skull were fractured in 17 places and he required emergency surgery. After trial, the court entered judgment for plaintiff on the unseaworthiness count. The circuit court reversed, stating that there was sufficient provocation and, despite the severity of the assault, the assailant was not of a disposition outside that of the typical seaman in the calling.

In this case, Troyer was clearly intoxicated, having had substantial amounts of alcohol that night. These activities cannot be impugned to the vessel owner as they took place while Troyer was on his own time and not involved in any vessel related activity. Yet, his intoxication is a mitigating factor in the unseaworthiness determination. See *Hildebrand v. S.S. Commander*, supra. Using a chainsaw in an assault while sober is far more indicative of a violent nature than while under the influence of alcohol.

There is also a complete absence of evidence of prior incidents of violence. The plaintiff himself has testified to this. Further, Troyer showed contrition after the attack when he advised Tedeschi that it looked like he would need 911. And it cannot be denied that there was significant provocation arising from the attack just one hour earlier. Although certainly not justifiable in defending a criminal charge of assault, the nature and severity of the prior attack, coupled with the level of intoxication of all the participants, can certainly be used to defend a charge that a person's subsequent actions indicate he is savage and vicious by nature. The court in *Mears*, supra. found verbal insults enough of a provocation for the assailant's repeated stabbing of the plaintiff. Therefore,

plaintiff's references to criminal cases standing for the proposition that a cooling off period after an assault nullifies a claim of justification has little if any relevance here. The unmistakable result in this case is that the prior attack constitutes a significant mitigating factor, among others, in determining Troyer's nature. Similarly, the court in *Kable*, supra. found the assailant's attack on the plaintiff to be a "continuation" of the plaintiff's prior attack on the assailant which had occurred one hour prior.

## III. CONCLUSION

Based on the foregoing, it is clear that there are questions of fact that can only be resolved at trial. Defendant respectfully requests this court deny plaintiff's motion for partial summary judgment in every particular.

DEFENDANT,
By its Attorney,

J. Renn Olenn, Esq. #0623
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

Martin K. DeMagistris, Esq. #6089
OLENN & PENZA, LLP
530 Greenwich Avenue
Warwick, RI 02886
PHONE: (401) 737-3700
FAX: (401) 737-5499

**CERTIFICATION**

I certify that I sent a true copy of the within on 6/15/06 to:

Merlyn O'Keefe, Esq.
Packer & O'Keefe
1220 Kingstown Road
Peace Dale, RI 02879